In the

# United States Court of Appeals

### For the Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

## STEPHEN SIMMONS,

*Defendant - Appellant.*

## BRIEF OF APPELLANT STEPHEN SIMMONS

**Wesley P. Page**
**Federal Public Defender**

**Lex A. Coleman**
**Senior Litigator AFPD**

**Jonathan D. Byrne**
**Appellate Counsel**

**U. S. Courthouse, Room 3400**
**300 Virginia Street East**
**Charleston, West Virginia 25301**
**Telephone: (304) 347-3350**

*Counsel for Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iv

STATEMENT OF JURISDICTION ....................................................................... 1

ISSUE PRESENTED ................................................................................................ 1

STATEMENT OF THE CASE ............................................................................... 2

    A.    A search warrant is executed at Simmons' residence;
        Simmons is charged with possession of an
        unregistered machinegun. ........................................................................ 2

    B.    Simmons enters guilty plea, then raises *Bruen*-based
        objections to the application of U.S.S.G. § 2K2.1
        during the PSR process. ............................................................................ 3

    C.    Defendant is sentenced as an "unlawful user" under
        18 U.S.C. § 922(g)(3) and U.S.S.G. § 2K2.1. ...................................... 7

SUMMARY OF ARGUMENT ................................................................................ 10

ARGUMENT .............................................................................................................. 12

    A.    Standard of review ..................................................................................... 12

    B.    The Guidelines enhance a defendant's sentence in
        firearm cases based on the defendant's status as a
        prohibited person, even without the defendant
        being convicted of such. .......................................................................... 13

    C.    18 U.S.C. § 922(g)(3), the statute which designates
        Simmons as a prohibited person, violates the Second
        Amendment. ................................................................................................ 15

1. *Bruen* did away with the means-end balancing courts had done in the wake of *Heller*, requiring the Government to prove that any firearm regulation is consistent with this Nation's history and traditions. .................................. 15

    a. Before *Bruen*, lower courts resolved Second Amendment challenges by applying some form of means-ends scrutiny. .............. 17

    b. *Bruen* replaced means-ends balancing with a test rooted solely in the Second Amendment's "text and history." .................. 20

        i. Statutes addressing longstanding societal problems are subject to more rigorous scrutiny than firearm statutes addressing historically "unprecedented" challenges. .............................. 23

        ii. The Government must identify a "well-established and representative" tradition of comparable regulations. ................. 26

        iii. The Government bears the burden of demonstrating that a firearm regulation is consistent with the Nation's historical tradition. .................................. 28

    c. Section 922(g)(3) fails *Bruen*'s "text-and-history" Second Amendment standard and has been unconstitutionally applied to Simmons. ...................... 28

        i. The Second Amendment's "plain text" protects Simmons' possession of non-NFA firearms. ............................. 29

    2.   The Government failed to show that § 922(g)(3)
         is consistent with the United States' "historical
         tradition of firearm regulation." ................................. 39

         a.   There is no tradition of statutes "distinctly
              similar" to § 922(g)(3). .................................... 39

D.   18 U.S.C. § 922(g)(3) is also unconstitutionally vague. ...................... 46

E.   The district court's error materially impacted
     Simmons' sentence. ................................................. 47

CONCLUSION ........................................................................ 48

REQUEST FOR ORAL ARGUMENT .................................................. 48

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Campiti v. Garland*, 649 F. Supp. 3d 1 (D. Conn. 2023) ............................................. 38

*District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783 (2008) .................... *Passim*

*Johnson v. United States*, 576 U.S. 591 (2015) .......................................... 46, 47

*Love v. Pepersack,* 47 F.3d 120 (4th Cir. 1995) ............................................. 17

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ............................................ 18, 20, 35

*Miller v. Bonta*, 2023 WL 6929336 (S.D. Cal. 2023) .................................................. 30

*National Rifle Ass's of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185 (5th Cir. 2012) ................................................ 43

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)...*Passim*

*Peugh v. United States*, 569 U.S. 530 (2013) ...................................................... 48

*Raffone v. Adams*, 468 F.2d 860 (2d Cir. 1972) ............................................. 15

*Range v. Attorney General United States of America*, 69 F.4th 96, 101-103 (3d Cir. 2023)....................................................................35-36

*Stimmel v. Sessions*, 879 F.3d 198 (6th Cir. 2018) ........................................ 33

*United States v. Allen*, 909 F.3d 671 (4th Cir. 2018) .................................... 13

*United States v. Alston*, 2023 WL 4758734 (E.D.N.C. 2023) ...................................... 37

*United States v. Barber*, 2023 WL 1073667 (E.D. Tex. 2023)...................................... 38

*United States v. Bernard*, 2022 WL 17416681 (N.D. Iowa 2022) ................................ 38

*United States v. Booker*, 543 U.S. 220 (2005) .................................................. 12

*United States v. Booker*, 644 F.3d 12 (1st Cir. 2011) ..................................................... 42

*United States v. Brooks*, 2023 WL 6880419 (E.D. Ky. 2023) ...................................... 37

*United States v. Brown*, 2023 WL 4826846 (D. Utah 2023) ........................................ 38

*United States v. Bullock*, 2023 WL 4232309 (S.D. Miss. 2023) ................................... 37

*United States v. Carter*, 750 F.3d 462 (4th Cir. 2014) ............................................ 17, 20

*United States v. Chapman*, 666 F.3d 220 (4th Cir. 2012) .............................................. 19

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) ............................................ 17, 19

*United States v. Coleman*, 2023 WL 6690935 (E.D. Va. 2023) ................................... 37

*United States v. Combs*, 2023 WL 1466614 (E.D. Ky. 2023) ...................................... 38

*United States v. Connelly*, 2023 WL 2806324 (W. D. Tex. 2023) ............................... 37

*United States v. Cruikshank*, 92 U.S. 542, 553 (1875) ................................................. 17

*United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023) ................................................ 36

*United States v. Davila*, 2023 WL 5361799 (S.D.N.Y. 2023) ...................................... 37

*United States v. Espinoza-Melgar*, 2023 WL 5279654 (D. Utah 2023) ....................... 36

*United States v. Ford*, 2023 WL 7131742 (S.D.N.Y. 2023) ........................................ 37

*United States v. Gall,* 128 S. Ct. 586 (2007) ................................................................. 48

*United States v. Gates*, 2023 WL 5748362 (N.D. Ill. 2023) ........................................ 37

*United States v. Goins*, 647 F. Supp. 3d 538 (E.D. Ky. 2022) ..................................... 38

*United States v. Gore*, 2023 WL 2141032 (S.D. Ohio 2023) ....................................... 38

*United States v. Guthery*, 2023 WL 2696824 (E.D. Cal. 2023) .................................... 38

*United States v. Hargrove*, 478 F.3d 195 (4th Cir. 2007) ................................................ 12

*United States v. Harrison*, 2023 WL 1771138 (W.D. Okla. 2023) ................. 37, 40, 42

*United States v. Hasson*, 26 F.4th 610 (4th Cir. 2022) ...................................... 47

*United States v. Hernandez*, 2023 WL 4161203 (N.D. Tex. 2023) ............................ 37

*United States v. Hester*, No. 1:22-cr-20333-RNS (S.D. Fla. Jan. 27, 2023) ............... 38

*United States v. Hicks*, 2023 WL 164170 (W.D. Tex. 2023) ...................................... 38

*United States v. Holmes*, 2023 WL 4494340 (E.D. Mich. 2023) ................................ 37

*United States v. Hosford*, 843 F.3d 161 (4th Cir. 2016) ........................................... 17, 20

*United States v. Jackson*, 2022 WL 3582504 (W.D. Okla. 2022) ................................ 38

*United States v. Jackson*, 2023 WL 7160921 (N.D. Ill. 2023) .................................... 37

*United States v. Johnson*, 497 F.3d 548 (4th Cir. 1974) ........................................... 17

*United States v. Johnson*, 2023 WL 6049529 (W.D. Okla. 2023) ............................... 37

*United States v. Johnson*, 2023 WL 6690388 (N.D. Ill. 2023) .................................... 37

*United States v. Kays*, 624 F. Supp. 3d 1262 (W.D. Okla. 2022) ............................... 39

*United States v. Lane*, 2023 WL 5614798 (D. Vt. 2023) ........................................... 37

*United States v. Levasseur*, 2023 WL 6623165 (D. Me. 2023) ................................... 37

*United States v. Lewis*, 2023 WL 187582 (W.D. Okla. 2023) .................................... 37

*United States v. Lewis*, 2023 WL 4604563 (S.D. Ala. 2023) ...................................... 37

*United States v. Lewis*, 2023 WL 6066260 (S.D.N.Y. 2023) ...................................... 38

*United States v. Lowry*, 2023 WL 3587309 (D.S.D. 2023) ........................................ 37

*United States v. Mahin*, 668 F.3d 119 (4th Cir. 2012) ................................................... 17

*United States v. Martin*, 2023 WL 1767161 (D. Vt. 2023) ........................................... 38

*United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015) .................................. 32

*United States v. Morales-Lopez*, 2022 WL 2355920 (D. Utah 2022) .................... 46, 47

*United States v. Nordvold*, 2023 WL 5596623 (D.S.D. 2023) ....................................... 37

*United States v. Okello*, 2023 WL 5515828 (D.S.D. 2023) .......................................... 36

*United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) ................................................ 12

*United States v. Perez-Gallan*, 640 F. Supp. 3d 697 (W.D. Tex. 2022) ................. 31, 33

*United States v. Pierre*, No. 1:22-cr-20321-JEM (S.D. Fla. Nov. 28, 2022) .............. 38

*United States v. Price*, 635 F. Supp. 3d 455 (S.D. W. Va. 2022) ................................. 38

*United States v. Prince*, 2023 WL 7220127 (N.D. Ill. Nov. 2, 2023) .......................... 37

*United States v. Pruess*, 703 F.3d 242 (4th Cir. 2012) ................................................ 17

*United States v. Quailes*, 2023 WL 5401733 (M.D. Pa. 2023) ..................................... 37

*United States v. Reaves*, No. 4:22-cr-224-HEA (E.D. Mo. Jan. 9, 2023) ................... 38

*United States v. Rowson*, 2023 WL 431037 (S.D.N.Y. 2023) ....................................... 38

*United States v. Ryno*, 2023 WL 3736420 (D. Alaska 2023) ....................................... 38

*United States v. Shell*, 789 F.3d 335 (4th Cir. 2015) ............................................. 12, 13

*United States v. Silvers*, 2023 WL 3232605 (W.D. Ky. 2023) ...................................... 38

*United States v. Springer*, 2023 WL 4981583 (N.D. Iowa 2023) ........................... 36, 38

*United States v. Stambaugh*, 641 F. Supp. 3d 1185 (W.D. Okla. 2022) ...................... 39

*United States v. Ware*, 2023 WL 3568606 (S.D. Ill. 2023) ............................................ 37

*United States v. White*, 2023 WL 6066201 (S.D.N.Y. 2023)......................................... 37

*United States v. Williams*, 2022 WL 18285005 (N.D. Ga. 2022)................................. 38

*United States v. Wuchter*, 2023 WL 4999862 (N.D. Iowa 2023)................................. 36

## Constitutional Provisions

National Archives, Milestone Documents, Bill of Rights,
https://www.archives.gov/milestone-documents/bill-of-rights .................... 15, 32

U.S. Const. amend. I ....................................................................... 11, 31, 32

U.S. Const. amend. II............................................................................*Passim*

U.S. Const. amend. IV ................................................................... 11, 31, 32

U.S. Const. amend. V....................................................................................... 46

U.S. Const. amend. IX .................................................................................11, 31

U.S. Const. amend. XIV ....................................................................................... 18

## Federal Statutes

15 U.S.C. §§ 901-909 ....................................................................................... 15

18 U.S.C. § 922.................................................................................................... 42

18 U.S.C. § 922(g) ................................................................................ 14, 16, 42

18 U.S.C. § 922(g)(1) ..............................................................................*Passim*

18 U.S.C. § 922(g)(3) ..............................................................................*Passim*

18 U.S.C. § 922(g)(8) ................................................................... 16, 31, 38

18 U.S.C. § 922(g)(9) .................................................................................16, 38

18 U.S.C. § 922(h) ........................................................... 16

18 U.S.C. § 922(n) ........................................................... 38

18 U.S.C. § 924(a)(8) ........................................................ 16

18 U.S.C. § 933 .............................................................. 16

18 U.S.C. § 3231 ............................................................. 1

18 U.S.C. § 3553(a) ....................................................... 6, 48

18 U.S.C. § 3742 ............................................................. 1

18 U.S.C. app. §§ 1201-1203 ................................................. 16

21 U.S.C. § 802 ............................................................. 42

26 U.S.C. §§ 5801-5872 ...................................................... 15

28 U.S.C. § 1291 ............................................................. 1

26 U.S.C. § 5835(a) ......................................................... 13

26 U.S.C. § 5841 ............................................................. 3

26 U.S.C. § 5845(a) ......................................................... 14

26 U.S.C. § 5845(b) .......................................................... 2

26 U.S.C. § 5854 ............................................................. 3

26 U.S.C. § 5861(d) ........................................................ 1, 3

26 U.S.C. § 5871 ........................................................... 1, 3

Act of June 26, 1934, c. 757, Pub. L. No. 73-474, 48 Stat. 1236
(codified at 26 U.S.C. §§ 5801-5872) (National Firearms Act) ................ 15

Act of June 30, 1938, c. 850, 52 Stat. 1250
(codified at 15 U.S.C. §§ 901-909) (Federal Firearms Act)......................................15

Pub. L. No. 87-342, 75 Stat. 757 (Oct. 4, 1961)
(An Act to Strengthen the Federal Firearms Act) .....................................................15

Pub. L. No. 90-351, 82 Stat. 236 (June 19, 1968)
(Gun Control Act of 1968 - Title VII,
Omnibus Crime Control and Safe Streets Act of 1968)
(codified at 18 U.S.C. app. §§ 1201-1203 (now repealed)) ..............................15, 36

Pub. L. No. 90-618, 82 Stat. 1213-1236 (Oct. 22, 1968)
(Title II, Omnibus Crime Control and Safe Streets Act of 1968) ..........................16

Pub. L. No. 90-618, 82 Stat. 1227-1236
(codified at 18 U.S.C. §§ 922(g) and (h))
(Title IV, Omnibus Crime Control and Safe Streets Act of 1968).........................16

Pub. L. No. 99-308, 100 Stat. 449 (May 19, 1986)
(Firearm Owners' Protection Act) ....................................................................16, 42

Pub. L. No. 103-159, Title I, 107 Stat. 1536 (Nov. 30, 1993)
(Brady Handgun Violence Prevention Act) .............................................................16

Pub. L. No. 103-322, 108 Stat. 1796
(Violent Crime Control and Law Enforcement Act of 1994).................................16

Pub. L. No. 104-208, 110 Stat. 3009, 3009-371to 372 (1996)
(Lautenberg Amendment to the Gun Control Act of 1968) ...................................16

Pub. L. No. 117-159, 136 Stat. 1313 (June 25, 2022)
(Bipartisan Safer Communities Act)........................................................................16

## State Statutes

1871 Tex. Gen. Laws § 1 ...............................................................................................41

## Guidelines

U.S.S.G. § 2K2.1..................................................................................................*Passim*

U.S.S.G. § 2K2.1(a) .......................................................................... 13

U.S.S.G. § 2K2.1(a)(4)(B) ........................................................ 3, 13, 14

U.S.S.G. § 2K2.1(a)(4)(B)(ii)(I) ........................................................*Passim*

U.S.S.G. § 2K2.1(a)(5) ...................................................................... 14

U.S.S.G. § 2K2.1(a)(7) ......................................................................... 3

U.S.S.G. § 2K2.1(b) ........................................................................... 47

U.S.S.G. § 2K2.1(b)(1) .................................................................. 14, 15

U.S.S.G. § 2K2.1(b)(1)(B) ................................................................. 14

U.S.S.G. § 2K2.1(b)(1)(C) ............................................................ 7, 14

U.S.S.G. § 2K2.1(b)(4) .................................................................. 5, 14

U.S.S.G. § 2K2.1(b)(4)(A) ........................................................ 7, 14, 15

## Other Authorities and Sources

Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551 (2009) ............................ 44

C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*,
32 Harv. J. L. & Pub. Pol'y 695 (2009) ...................................... 44

Carlton F.W. Larson, *Four Exceptions in Search of a Theory*,
60 Hastings L.J. 1371 (2009) ........................................................ 43

Lawrence Rosenthal, *The Limits of Second Amendment Originalism
and the Constitutional Case for Gun Control*,
92 Wash. U. L. Rev. 1187 (2015) ................................................ 44

Nelson Lund, *The Second Amendment, Heller, and Originalist Jurisprudence*,
56 UCLA L. Rev. 1343 (2009) ...................................................... 44

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139 (2007) .......................................... 43

Stephen P. Halbrook, *That Every Man Be Armed* (University of New Mexico Press 1984) .................................................... 45

Stephen P. Halbrook, *The Founders' Second Amendment* (Ivan R. Dee Publishers 2008) .......................................................... 45, 46

Stephen P. Halbrook, *When the Redcoats Confiscated Guns*, Washington Post (May 31, 1995), https://www.washingtonpost.com/archive/opinions/1995/05/31/when-the-redcoats-confiscated-guns/e38d0810-af85-4949-8d93-3da746601e65/ ................................................................................ 45

## STATEMENT OF JURISDICTION

On January 31, 2023, a federal grand jury sitting in Huntington, West Virginia, returned a single count indictment charging Simmons with possessing a "machinegun" that was not registered to him in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. §§ 5861(d) & 5871. JA012-013. Because that charge constituted an offense against the United States, the district court had original jurisdiction pursuant to 18 U.S.C. § 3231. This is an appeal from a final judgment and sentence imposed on September 12, 2023, JA103-110, after Simmons pled guilty to the indictment without a plea agreement. JA014-019. Simmons timely filed a notice of appeal on September 27, 2023. JA111. This Court has jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

## ISSUE PRESENTED

Whether Simmons' sentence is procedurally unreasonable where the district court (1) enhanced his base offense level under U.S.S.G. § 2K2.1(a)(4)(B)(ii)(I) due to classifying Simmons as a prohibited person under 18 U.S.C. § 922(g)(3), and (2) based on that designation included non-NFA firearms as part of his relevant conduct to further enhance Simmons' adjusted offense level when that statute and Guideline violate the Second Amendment, as analyzed under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

# STATEMENT OF THE CASE

### A. A search warrant is executed at Simmons' residence; Simmons is charged with possession of an unregistered machinegun.

On January 3, 2023, the ATF obtained a search warrant for Simmons' residence in Nitro, West Virginia. That same day officers established surveillance on Simmons' home and detained him as he was observed walking out the front door. Agents from the ATF Charleston Field Office then executed the search warrant. During that search several firearms, suspected firearm silencers, suspected machineguns, and "evidence of drug use" were seized. One item seized was a conversion part commonly known as a "Glock Switch," which when affixed would enable a Glock semi-automatic pistol to fire at the same rate as a machinegun with a single trigger pull. Based on that characteristic ATF treats Glock switches as falling within the definition of a "machinegun" in 26 U.S.C. § 5845(b), such that both the part and their owner are required to be registered in the National Firearms Registration and Transfer Record. The owner or possessor is further required to pay a Special Occupational Tax of $ 200 and obtain approval from the Treasury Secretary to lawfully possess the part. JA008-010.

On January 4, 2023, Simmons was charged by criminal complaint with unlawfully possessing a firearm (specifically the "Glock Switch") that was not registered to him in the National Firearms Registration and Transfer Record on

January 3, 2023 (as required by 26 U.S.C. §§ 5841 & 5854), in violation of 26 U.S.C. § 5861(d). JA006-011. On January 31, 2023, a federal grand jury sitting in Huntington, West Virginia, returned a single count indictment charging Simmons with the same conduct and offense, in violation of 26 U.S.C. §§ 5861(d) & 5871. JA012-013.

**B.    Simmons enters guilty plea, then raises *Bruen*-based objections to the application of U.S.S.G. § 2K2.1 during the PSR process.**

On May 10, 2023, Simmons pled guilty to his indictment without a plea agreement. JA014-019. Simmons subsequently received his draft pre-sentence investigation report ("PSR"). That report applied a base offense level ("BOL") 12 pursuant to U.S.S.G. § 2K2.1(a)(7) regarding his National Firearms Act ("NFA") violation, then increased his adjusted offense level ("AOL") by eight more levels based on the number of firearms involved (including non-NFA firearms) and the fact one of those non-NFA firearms was stolen. JA034.

On July 17, 2023, the United States objected to the PSR's starting BOL of 12. JA021-022; JA034-035. Specifically, the United States maintained that U.S.S.G. § 2K2.1(a)(4)(B) provided the correct starting BOL of 20 because the offense of conviction involved a NFA firearm *and* because Simmons was a prohibited person

3

during commission of that offense.[1] *Ibid.* Prior to Simmons filing any responsive PSR objections, the presentence writer informally notified the parties that she was revising the PSR BOL to 20. JA035.

Among other things, Simmons formally objected to the PSR's upward BOL adjustment due to his being a "prohibited person." JA142-143. Pertinent here, Simmons objected to conduct that was protected by the Second Amendment under the text and history standard set forth in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), being used (1) through 18 U.S.C. § 922(g)(3) and U.S.S.G. § 2K2.1(a)(4)(B)(ii)(I) to increase his starting BOL, and (2) to also include non-NFA firearms and a stolen non-NFA firearm in the total number of firearms involved in his "offense," thereby further increasing his AOL to enhance the prospective punishment for his NFA conviction.[2]

---

[1] Simmons had not been charged with, had not been convicted of, and did not admit to being a prohibited person under 18 U.S.C. § 922(g)(3) when he entered his guilty plea.

[2] Not all of the attributed 43 firearms were NFA "firearms," and were otherwise capable of being lawfully possessed without being registered on the National Firearms Registration and Transfer Record. JA118-122. The Ruger AR-556 rifle used to support application of the two-offense level stolen firearm enhancement was one of those non-NFA firearms. JA121. Nevertheless, the draft PSR included all of Simmons' non-NFA firearms seized on January 3, 2023 to determine his Sentencing Guideline range. JA124-125

In support of his objections, Simmons argued that irrespective of whether his conduct of possessing unregistered NFA firearms was protected by the Second Amendment, his keeping and bearing *non-NFA firearms* in his home plainly was conduct protected by the Second Amendment, rendering § 922(g)(3) and § 2K2.1(a)(4)(B)(ii)(I) presumptively unconstitutional. Simmons further argued where both § 922(g)(3) and the Sentencing Guidelines were plainly Twentieth Century conventions, that the United States could not carry its burden under *Bruen*'s second prong of proving either was consistent with any well-established national historical tradition of firearm regulation. As a consequence, by further burdening Simmons' protected non-NFA firearm conduct, § 922(g)(3) and § 2K2.1(b)(4) are unconstitutional under the Second Amendment and could not be used to further enhance Simmons' base offense level or to include additional non-NFA firearms in determining his final Guideline range for sentencing.

Had Simmons' PSR objections been sustained, worst case his starting BOL would have been 18 (previously Simmons incorrectly asserted it would have remained at 12), the six-level enhancement for the number of firearms would have only been a two-level enhancement (with two alleged "auto sears" and two Glock Switches, JA 118-120), and the stolen firearm enhancement would not have been applied (because the non-NFA-firearms would not have been included as any part of Simmons' relevant conduct). This would have produced an advisory Guideline

range of 24 to 30 months imprisonment (TOL 17/Cat. I) before consideration of any variance arguments and application of the statutory sentencing factors in 18 U.S.C. § 3553(a).

In light of the parties' PSR objections, the probation officer requested a continuance of sentencing, which the district court granted. As part of that order, the Court directed the parties to further brief defendant's *Bruen*-based PSR objections. JA020.

Simmons' sentencing memorandum reiterated the substance of his PSR objections, applying *Bruen* to § 922(g)(3) and § 2K2.1. JA021-033. Simmons separately asserted that by not defining "unlawful user of controlled substances" § 2K2.1 and § 922(g)(3) are also unconstitutionally vague.

In response, the United States first asserted that the Second Amendment and *Bruen* are not applicable to the U.S. Sentencing Guidelines. JA036. The United States claimed even if they were, Simmons was not a "law abiding citizen" entitled to any Second Amendment protections under *Bruen*'s first step. JA037-038. Relying on Simmons' January 3, 2023 statement, and conduct not subsequently considered by the district court at sentencing, the United States separately maintained that § 922(g)(3) and § 2K2.1(a)(4)(B)(ii)(I) were not unconstitutionally vague as applied to Simmons. JA038-040. The United States made absolutely no effort to establish that § 922(g)(3) and § 2K2.1(a)(4)(B)(ii)(I) were consistent with any well-established,

robust tradition of firearm regulation under *Bruen*. JA074. Instead, the United States concluded that Simmons was a prohibited person under § 922(g)(3) in possession of unregistered NFA weapons, such that a BOL of 20 should be applied under § 2K2.1(a)(4)(B)(ii)(I). The United States further concurred with the inclusion of non-NFA firearms as part of Simmons' "offense" to support application of the number of firearm and stolen firearm enhancements in U.S.S.G. §§ 2K2.1(b)(1)(C) and (b)(4)(A), such that the appropriate total offense level after acceptance should have been 25. JA041.

### C. Defendant is sentenced as an "unlawful user" under 18 U.S.C. § 922(g)(3) and U.S.S.G. § 2K2.1.

Sentencing was conducted on September 12, 2023. The parties reasserted the positions stated in their written submissions, with Simmons noting that including the non-NFA firearms as relevant conduct "goes into treating my client as a prohibited person" rather than someone convicted of having unregistered NFA weapons. JA049. Addressing Simmons' objections, the district court focused solely on the January 3, 2023 conduct in the PSR.[3] Based largely on Simmons' attributed

---

[3] The PSR included disputed matters significantly predating Simmons' January 3, 2023 arrest and related search of his apartment, which the district court did not take into consideration in determining Simmons' Guideline calculations. This appeal pertains solely to matters concerning the attributed January 3, 2023 conduct, and the district court's treatment of his legal objections concerning them, which is why defendant's statement of the case only addresses those circumstances and arguments.

statements in the PSR, that his wife had an affair which led him to start abusing drugs again, and that he had started using Adderall and methamphetamine for the past two to three months prior to his January 3, 2023 arrest, the Court overruled Simmons' PSR objections and found that he was a "prohibited person" as defined by 18 U.S.C. § 922(g)(3). JA063-065.

"I do believe in this case that it is appropriate as determined in the Presentence Report to apply the [§ 2K2.1(b)(4)(B)(ii)(I)] enhancement here." JA077-078. This was "not so much a matter of punishing status but, rather, conduct," and the "enhancement is triggered because of the defendant's illegal drug use." JA078. The district court also found "the fact this is a sentencing enhancement does differentiate it from the context in which *Bruen* and *Heller*[4] were decided" and that Simmons was "being punished for his violation of a federal gun law that he doesn't challenge." *Ibid.* Simmons' argument that "the fact of his drug use and/or addiction shouldn't be used by a judge to increase his sentence within the statutory range provided for this particular crime" was "wrong." *Ibid.* Furthermore, "there has to be a connection between that conduct and the criminal activity" and it was not a "stretch at all to conclude that with respect to people who violate gun laws, there is increased culpability and greater risk to the public if that person is also

---

[4] *District of Columbia v. Heller*, 554 U.S. 570 (2008).

engaged in illegal drug activity." JA079. The district court concluded that "I think the guideline is appropriately applied, so I deny your objection" and "as the government argues that brings in the [non-NFA] firearms and results in a total number that meets the threshold for the six level increase that was applied as well." *Ibid.* Including all the non-NFA firearms seized on January 3, 2023, also provided the factual support for the additional two-offense level enhancement based on the Ruger being stolen. Relative to those findings, the Court calculated Simmons' advisory Guidelines to include a term of incarceration for between 57 to 71 months. JA082-083.

With the district court having settled on its Guideline calculations, the Government argued for a sentence within the advisory Guideline range, citing deterrence, and explaining that "Glock switches . . . are turning up in violent crimes across the nation" and a "sentence within the calculated guideline range here sends a deterrent message." JA083. Simmons argued for a sentence of no more than 36 months in prison. JA085-088. He noted his history of employment and success in higher education, along with the fact that "there is no evidence or history of violence on his part at all." *Ibid.* Simmons was "not a dangerous person," but one who has "a very big interest in the mechanics and technology of firearms." He did not use them threaten or hurt others in any way. JA086.

The district court ultimately sentenced Simmons to 36 months in prison, followed by a three-year term of supervised release. JA096-097. The district court recognized that the advisory Guideline range was "driven first by the defendant's circumstance of possessing many firearms" and doing so "at a time when he was a drug user or addict." JA093-094. Regardless, Simmons' criminal conduct involved the simple possession of unregistered NFA weapons and "it doesn't seem to me that his conduct really goes beyond that." JA094. As a result, "the guideline overstates the seriousness of his crime and the nature of his offense." JA094-095.

## SUMMARY OF ARGUMENT

18 U.S.C. § 922(g)(3) and U.S.S.G. § 2K2.1(a)(4)(B)(ii)(1) are unconstitutional under the "text-and-history standard" of *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). *Bruen* instructs that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and the Government may rebut the presumption of unconstitutionality only by showing that "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. The district court erred by denying Simmons' *Bruen*-based Second Amendment and vagueness objections to the calculation of his Sentencing Guidelines.

First, at the very least, the Second Amendment's "plain text" expressly protects the conduct of keeping and bearing non-NFA "arms" in the home, even

by an "unlawful user" or drug addict. Specifically, the Second Amendment's plain text entitles "the people" to the right to keep and bear arms, and nothing in that text or the Supreme Court's cases suggests citizens potentially falling within § 922(g)(3) are not among "the people." Excluding unlawful users and addicts from Second Amendment protection would violate the holding of *District of Columbia v. Heller*, 554 U.S. 570 (2008), that "the people" includes everyone who is "part of [the] national community;" that the right to bear arms "belongs to all Americans;" and that "the people" means the same thing in the Second Amendment as it does in the First, Fourth, and Ninth Amendments.

Second, the Government did not even *try* to rebut the presumption that § 922(g)(3), and thereby § 2K2.1(b)(4)(B)(ii)(I), are unconstitutional. To the extent the position is not deemed waived, the United States will still not be able to carry the burden of *Bruen*'s second step before this Court. The United States' "historical tradition of firearm regulation" shows that drug user or addict-disarmament laws did not appear until the early 20th century, well after the period *Bruen* deems relevant. The Sentencing Reform Act, and U.S. Sentencing Guidelines, were then enacted roughly fifty years later. The Government cannot discharge its burden by likening § 922(g)(3) to laws that disarmed other supposedly "dangerous" or "unvirtuous" groups generally. Those categories are far too broad under a proper

*Bruen* analysis, and the Government has identified no "regulations" – i.e., legal proscriptions – that substantiate such a tradition, as *Bruen* requires.

Third, independent of the relevant *Bruen* analysis, 18 U.S.C. § 922(g)(3) and § U.S.S.G. 2K2.1(a)(4)(B)(ii)(I) are unconstitutionally vague.

The district court's error led to the incorrect calculation of Simmons' advisory Guideline range, leading to the imposition of a procedurally unreasonable sentence that must now be vacated.

## ARGUMENT

### A. Standard of review

In an advisory Guideline system, "[t]he courts of appeals review sentencing decisions for unreasonableness." *United States v. Booker*, 543 U.S. 220, 261 (2005). This Court has held that "[o]ur appellate review of the reasonableness of a sentence focuses on whether the sentencing court abused its discretion in imposing the chosen sentence." *United States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007). The first step in that review is for this Court to determine whether there have been any "significant procedural errors." *Ibid.* District courts must "still calculate the correct guidelines range in order to fashion a reasonable sentence." *United States v. Hargrove*, 478 F.3d 195, 197 (4th Cir. 2007). Whether the district court's application of U.S.S.G. § 2K2.1 violated the Second Amendment is a question of law. This Court reviews questions of law related to Guideline calculations *de novo. United States v.*

*Shell*, 789 F.3d 335, 338 (4th Cir. 2015); *United States v. Allen*, 909 F.3d 671, 677 (4th Cir. 2018).

> **B.** **The Guidelines enhance a defendant's sentence in firearm cases based on the defendant's status as a prohibited person, even without the defendant being convicted of such.**

The applicable Guideline for most firearm offenses, whether they are based on the defendant's particular status (as a felon, drug user, or domestic abuser) or the type of weapon involved (such as machineguns, silencers, and other weapons regulated by the National Firearms Act) is U.S.S.G. § 2K2.1. The Guideline sets both the base offense level for such offenses and sets forth numerous enhancements that apply in particular cases. In Simmons' case, the question is whether both of those features are limited by the Second Amendment, as set forth in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

Section 2K2.1(a) sets forth numerous base offense levels that apply to different categories of offenders based on the offense of conviction, the defendant's criminal history, and other factors, including characteristics of the weapon involved. Some base offense levels require a combination of these factors. As relevant to this case, § 2K2.1(a)(4)(B) provides for a base offense level of 20 if

the case involves both a "firearm that is described in 26 U.S.C. § 5845(a)"[5] *and* the defendant "was a prohibited person at the time the defendant committed the instant offense." By contrast, a base offense level of 18 applies if a non-prohibited person possesses "a firearm described in 26 U.S.C. § 5835(a)" under § 2K2.1(a)(5). "Prohibited person" is defined as including "any person described in 18 U.S.C. § 922(g)," which would include someone who is "an unlawful user of or addicted to any controlled substance" under § 922(g)(3). U.S.S.G. § 2K2.1 cmt. n.3. Subsection (b)(1) separately provides for enhancements based on the number of firearms involved, including a four-level enhancement where 8 to 24 firearms are involved, and a six-level enhancement where between 25 and 99 firearms are involved. U.S.S.G. §§ 2K2.1(b)(1)(B) & (C). Subsection (b)(4) applies an additional two-level enhancement is *any* firearm was stolen. U.S.S.G. § 2K2.1(b)(4)(A).

The district court's conclusion that Simmons was a prohibited person under § 922(g)(3) effectively enhanced his advisory Guideline range by eight offense levels. Without that designation, Simmons' base offense level would have been 18, under § 2K2.1(a)(5), rather than 20 under § 2K2.1(a)(4)(B). Similarly, without that designation, the only firearms attributable to Simmons as relevant conduct would be those unregistered NFA weapons he possessed, resulting in a two-level, rather

---

[5] There is no dispute that the unregistered NFA weapons Simmons possessed meet that definition.

than six-level, enhancement under § 2K2.1(b)(1), and no application of 2K2.1(b)(4)(A) at all. The district court erred by classifying Simmons under § 922(g)(3), as that statute violates the Second Amendment. As a result, Simmons' sentence is procedurally unreasonable and should be vacated.

> **C. 18 U.S.C. § 922(g)(3), the statute which designates Simmons as a prohibited person, violates the Second Amendment.**
>
> > **1. *Bruen* did away with the means-end balancing courts had done in the wake of *Heller*, requiring the Government to prove that any firearm regulation is consistent with this Nation's history and traditions.**

The Second Amendment was ratified December 15, 1791,[6] and provides: A "well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Every existing federal firearm regulation was subsequently enacted during the Twentieth Century or later.[7] Citizen disarmament regulations of such recent vintage

---

[6] *See, e.g.,* U.S. Const. amend. II, historical note; *Raffone v. Adams*, 468 F.2d 860, 864 n.4 (2d Cir. 1972); National Archives, Milestone Documents, Bill of Rights, https://www.archives.gov/milestone-documents/bill-of-rights.

[7] *See, e.g.,* Act of June 26, 1934, c. 757, Pub. L. No. 73-474, 48 Stat. 1236, codified at 26 U.S.C. §§ 5801-5872 (National Firearms Act); Act of June 30, 1938, c. 850, 52 Stat. 1250, 1251, codified at 15 U.S.C. §§ 901-909 (Federal Firearms Act); Pub. L. No. 87-342, 75 Stat. 757 (October 4, 1961)(An Act to Strengthen the Federal Firearms Act - amended FFA to delete "citizens convicted of crimes of violence," and replace them with "citizens having felony convictions"); Pub. L. No. 90-351, 82 Stat. 236, effective June 19, 1968 (Gun Control Act of 1968 - Title VII, Omnibus

simply do not comport with the requirements of the Second Amendment after

*Bruen.*

---

Crime Control and Safe Streets Act of 1968, codified at 18 U.S.C. app. §§ 1201-1203 (now repealed) - categorically made it unlawful for felons, veterans with dishonorable discharges, mental incompetents, illegal aliens, and former citizens who had renounced their citizenship to *possess* firearms); Pub. L. No. 90-618, 82 Stat. 1213-1236, effective October 22, 1968 (Title II, Omnibus Crime Control and Safe Streets Act of 1968; strengthened 1934 NFA. Added "destructive devices" to definition of firearm; expanded definition of "machinegun"); 82 Stat. 1227-1236, codified at 18 U.S.C. §§ 922(g) and (h)(Title IV, Omnibus Crime Control and Safe Streets Act of 1968; categorically prohibited persons under indictment, felons, fugitives from justice, users or addicts of drugs, and persons adjudicated mental defectives or committed to a mental institution from transporting or receiving firearms in interstate commerce; folded 1938 FFA, as amended, into the Gun Control Act as part of the OCCSSA of 1968); Pub. L. No. 99-308, 100 Stat. 449, effective May 19, 1986 (Firearm Owners' Protection Act; reopened interstate sales of long guns, legalized ammunition shipments through the US Postal Service, removed record keeping requirements for non-armor piercing ammunition, banned sale of machine guns manufactured after enactment date to civilians, added possession of a firearm as an unlawful act under § 922(g)); Pub. L. No. 103-159, Title I, 107 Stat. 1536, effective November 30, 1993 (Brady Handgun Violence Prevention Act); Pub. L. No. 103-322, 108 Stat. 1796 (Violent Crime Control and Law Enforcement Act of 1994 – added Sec. 922(g)(8), persons under domestic violence restraining orders, to the GCA of 1968); Pub. L. No. 104-208, 110 Stat. 3009, 3009-371 to 372 (1996)(Lautenberg Amendment to the Gun Control Act of 1968**;** added Section 922(g)(9) prohibiting domestic violence misdemeanants from possessing firearms); Pub. L. No. 117-159, 136 Stat. 1313, June 25, 2022 (Bipartisan Safer Communities Act – added separate straw purchaser offenses to Title 18, as Sec. 933; increased all penalties under Sec. 922(g) to a maximum 15 years, Sec. 12004, moved firearm possession penalties to Sec. 924(a)(8); expanded GCA Sec. 922(g)(9) to include current or former dating relationships, Sec. 12005).

a. **Before *Bruen*, lower courts resolved Second Amendment challenges by applying some form of means-ends scrutiny.**

Prior to *District of Columbia v. Heller*, 554 U.S. 570 (2008), challenges to federal firearm regulations were resolved through rational basis means-end scrutiny, subject to the now unconstitutional collectivist interpretation of the Second Amendment. *See, e.g., Love v. Pepersack,* 47 F.3d 120, 124 (4th Cir. 1995); *United States v. Johnson*, 497 F.3d 548, 550 (4th Cir. 1974). After *Heller* most, if not all, of these same firearm regulations were again sustained, in the context of challenges to federal criminal statute, through intermediate means-end scrutiny subject to the individual rights interpretation of the Second Amendment. *See, e.g., United States v. Hosford*, 843 F.3d 161 (4th Cir. 2016); *United States v. Carter*, 750 F.3d 462 (4th Cir. 2014); *United States v. Pruess*, 703 F.3d 242 (4th Cir. 2012); *United States v. Mahin*, 668 F.3d 119 (4th Cir. 2012); *United States v. Chester*, 628 F.3d 673, 676 (4th Cir. 2010)(noting *Heller*'s explanation of how rational-basis scrutiny would be inappropriate for analyzing infringements on individual Second Amendment rights).

In *Heller*, the Supreme Court held the Second Amendment codified a pre-existing[8] "individual right to possess and carry weapons in case of confrontation."

---

[8] *See United States v. Cruikshank*, 92 U.S. 542, 553 (1875)(The right of "bearing arms for a lawful purpose" is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The Second Amendment simply declares that it shall not be infringed).

*Heller,* 554 U.S. at 592, 624. The Court canvassed "the historical background of the Second Amendment," including English history from the 1600s through American independence, law and practice in the colonial and early-Republic periods, and evidence of how the Second Amendment was interpreted in the century after its enactment (e.g., legal treatises, pre-Civil War case law, post-Civil War legislation, and late-19th-century commentary). *Id.* at 592-619. Based on this survey, the Court concluded the Second Amendment "confers an individual right to keep and bear arms" that is "not limited to the carrying of arms in a militia." *Id.* at 586, 622. The Court therefore struck down District of Columbia statutes that prohibited the possession of handguns in the home and required that any other guns in the home be kept inoperable. *Id.* at 628-34.

Two years later, in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court extended the individual right recognized by *Heller* to the states through the Fourteenth Amendment Due Process Clause. In so incorporating Second Amendment protections, the Court described the right to keep and bear arms as "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition." *Id.* at 767. This right, the Court warned, should not be treated "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id.* at 780.

In *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010), this Court developed a "two-part approach" for resolving post-*Heller* Second Amendment claims. The first step asked "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee," as it was understood "at the time of ratification." *Ibid.* If it did not, the challenge failed. But if the statute did "burden[] conduct that was within the scope of the Second Amendment as historically understood," the Court then "appl[ied] an appropriate form of means-end scrutiny." *Ibid.* At the United States' urging, within this framework this Court opted to define "conduct" not just by what a given citizen was doing with a firearm, but also by who they were. Through this non-textual categorial add-on, the Court divided Second Amendment protections into two categories – those that applied to "law-abiding" citizens, and those that applied to persons who were not "law-abiding" citizens. "Law-abiding citizens" is not found in the Second Amendment's plain text, and no court has ever managed to define the term. This Court nevertheless employed strict scrutiny if a challenger's claim implicated "the core right" recognized in *Heller* – "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *United States v. Chapman*, 666 F.3d 220, 224, 226 (4th Cir. 2012). Otherwise, intermediate scrutiny applied. *Id.* at 225-226. Both forms of scrutiny involved weighing the governmental interest in firearm restrictions against the challenger's interest in keeping and

bearing arms. *See United States v. Hosford*, 843 F.3d 161, 168 (4th Cir. 2016). What differed between them were the magnitude of the governmental interest at issue, and the closeness of the fit. Using intermediate scrutiny, where there was a "reasonable fit" between the regulation and governmental interest - this Court deferred to Congress and sustained the regulation. More often than not, as opposed to finding that a given category of undefined "non-law-abiding citizens" enjoyed some limited Second Amendment protections, this Court would "assume without finding" that they did and sustain the challenged firearm regulation using intermediate scrutiny. *See, e.g., United States v. Carter*, 750 F.3d 462, 464 (4th Cir 2014). By 2014, intermediate scrutiny had become the accepted standard of review for Second Amendment challenges to federal criminal firearm laws.

> **b. *Bruen* replaced means-ends balancing with a test rooted solely in the Second Amendment's "text and history."**

Fourteen years after *Heller,* the Supreme Court in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), disavowed this Court's intermediate scrutiny framework in holding that "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id.* at 2127. In its place, the Supreme Court adopted a "text-and-history" standard more consistent with *Heller*'s methodology. *Id.* at 2138. This standard directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's conduct." *Id.*

at 2126. If it does, then "the Constitution presumptively protects that conduct." *Ibid.* Answering this preliminary question in *Bruen* was straightforward. At issue was a New York law providing that to obtain a permit to carry a concealed handgun in public, an applicant had to demonstrate "proper cause," i.e., "a special need for self-protection distinguishable from that of the general community." *Id.* at 2122-23. The Supreme Court "ha[d] little difficulty concluding" that "the Second Amendment protect[ed] [the petitioners'] proposed course of conduct – carrying handguns publicly for self-defense." *Id.* at 2134. As the Court explained, "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Ibid.* The Second Amendment therefore "presumptively guarantee[d]" a right to carry firearms in public, and New York's "proper cause" requirement, which infringed that right, could pass constitutional muster only if the state overcame the presumption. *Id.* at 2129-30, 2135.

To rebut the presumption of unconstitutionality, *Bruen* held, "the government may not simply posit that [a] regulation promotes an important interest." *Bruen*, 142 S. Ct. at 2126. "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Ibid.* This test requires courts to "consider

whether 'historical precedent' . . . evinces a comparable tradition of regulation." *Id.* at 2131-32. If "no such tradition" exists, then the statute being challenged is unconstitutional. *Id.* at 2132. The Court explained that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Id.* at 2136 (emphasis in original). For that reason, the relevant "historical tradition" for purposes of a federal gun regulation is that which existed in 1791, when the Second Amendment was ratified. *Id.* at 2136. Courts may look to the tradition of firearms regulation "before . . . and even after the founding" period, but they should do so with care. *Id.* at 2131-32. *Bruen* cautioned, for example, that "[h]istorical evidence that long predates [1791] may not illuminate the scope of the [Second Amendment] right if linguistic or legal conventions changed in the intervening years." *Id.* at 2136. Courts should not "rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies." *Ibid.*

Conversely, courts must "guard against giving postenactment history more weight than it can rightly bear." *Bruen*, 142 S. Ct. at 2136. Evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation." *Ibid.* But the farther forward in time one goes from 1791, the less probative historical evidence becomes. *Id.* at 2137 ("As we recognized in *Heller*

itself, because post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources."). Evidence from "the mid- to late-19th-century" provides little "insight into the meaning of the Constitution in [1791]." *Ibid.* Courts should therefore credit such history to the extent it provides "confirmation" of prior practice but should otherwise afford it little weight. *Ibid.* That is because "post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Ibid.*; *see also id.* at 2154 n.28 (ignoring "20th-century historical evidence" because it is too far removed from 1791).

In *Bruen* the Supreme Court held that because New York could not point to a robust tradition of regulations similar to the proper-cause requirement, the state's statute violated the Second Amendment. *Bruen*, 142 S. Ct. at 2138-56. In reaching its conclusion, the Court did not elaborate a comprehensive scheme for evaluating historical evidence, but rather staked certain guideposts for lower courts to follow.

      i.    **Statutes addressing longstanding societal problems are subject to more rigorous scrutiny than firearm statutes addressing historically "unprecedented" challenges.**

With respect to *Bruen*'s second prong, the Supreme Court explained that the standard for reviewing historical evidence differs depending on what kind of

problem a statute is intended to remedy – specifically, whether that problem is old or new. In "some cases," where a challenged statute "addresses a general societal problem that has persisted since the 18th century," the historical "inquiry will be fairly straightforward." *Bruen*, 142 S. Ct. at 2131. The Government can defend such statutes only by identifying a tradition of "distinctly similar" regulations from the founding era. *Ibid.* If "the Founders themselves could have adopted" a particular regulation to "confront" a problem that existed in 1791, but did not do so, then that regulation is unconstitutional today. *Ibid.*

In "other cases," a challenged statute will "implicat[e] unprecedented societal concerns or dramatic technological changes," or will be addressed to "challenges" that are "not . . . the same as those that preoccupied the Founders in 1791." *Bruen*, 142 S. Ct. at 2132. Historical inquiry into these statutes "may require a more nuanced approach," which "will often involve reasoning by analogy." *Ibid.* Deciding "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are relevantly similar." *Ibid. Bruen* declined to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," but it identified "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. In other words, "whether modern and historical regulations impose a comparable burden on the right of

armed self-defense [i.e., the 'how'] and whether that burden is comparably justified [i.e., the 'why'] are central considerations when engaging in an analogical inquiry." *Id.* at 2133 (emphasis omitted).

This latter approach to *Bruen*'s historical inquiry – which the Supreme Court called "analogical reasoning," *Bruen*, 142 S. Ct. at 2132 – is less difficult for the Government to satisfy. Courts, however, may only employ that approach when the challenged statute is geared toward a societal problem that was "unimaginable at the founding." *Ibid.* It is not available when the challenged statute "addresses a general societal problem that has persisted since the 18th century." *Id.* at 2131.

While the Supreme Court referred to the more deferential relevantly similar inquiry as using "analogical reasoning," both historical approaches arguably utilize analogies. That they both function the same way varying in the degree of fit, however, does not make them interchangeable. *Bruen* does *not* say the means most likely to sustain the firearm regulation dictates the method of historical inquiry. *Bruen's* historical second prong is not linear or multi-tiered. If a distinctly similar historical analogue does not exist regarding a societal problem which existed at the Founding, the challenged regulation is unconstitutional. That is the end of the inquiry. The Government is not permitted a less demanding "do-over" to explore whether there might be an alternately "relevantly similar" historical analogue. The distinctly similar and relevantly similar inquiries operate as alternatives: one applies

to statutes aimed at *old* problems, the other applies to statutes aimed at *new* problems. The relevantly similar inquiry is not a supplemental approach the Court may turn to if the distinctly similar analysis does not work out. *Bruen,* 142 S. Ct. at 2131-2134. If it were, then there was no reason for the *Bruen* majority opinion to have even mentioned the "distinctly similar" approach at all.

With this structural distinction in mind, courts faced with a *Bruen* challenge must identify the problem at which a statute is aimed, and then determine whether that problem existed in 1791 or instead grows out of "unprecedented," "unimaginable" societal changes. *Bruen*, 142 S. Ct. at 2132.

### ii. The Government must identify a "well-established and representative" tradition of comparable regulations.

Whether sifting through "distinctly similar" precursors or merely "relevantly similar" historical analogues, the "comparable tradition of regulation" must be robust. To carry its burden, the Government must show that the historical tradition on which it relies is "*well-established and representative*." *Bruen*, 142 S. Ct. at 2133 (emphasis added); *see also id.* at 2137 (explaining that "a governmental practice" can "guide [courts'] interpretation of an ambiguous constitutional provision" if that practice "has been open, widespread, and unchallenged since the early days of the Republic"). Importantly, a handful of "outlier[]" statutes or cases from a few "outlier jurisdictions" do not make out a historical tradition. *Id.* at 2153, 2156. The

Supreme Court expressed "doubt," for instance, that statutes from only three of the original thirteen colonies would establish a relevant tradition. *Id.* at 2142. And in evaluating 19th-century "surety laws," which New York argued were precursors to its proper-cause requirement, the Court discounted two of those ten laws – which were most similar to New York's – as unrepresentative. *Id.* at 2148 n.24. Here, the relevant date for the historical analysis is December 15, 1791, when the Second Amendment was ratified. At that time the United States as a nation consisted of the following states:



### iii. The Government bears the burden of demonstrating that a firearm regulation is consistent with the Nation's historical tradition.

Finally, *Bruen* emphasized that "the burden falls on [the Government] to show that [a statute] is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135. Consistent with "the principle of party presentation," courts are "entitled to decide a case based on the historical record compiled by the parties." *Id.* at 2130 n.6. As a consequence, courts "are not obliged to sift the historical materials for evidence to sustain [a] statute. That is [the Government's] burden." *Id.* at 2150. And insofar as there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id.* at 2141 n.11. The tie goes to the Second Amendment claimant. *See also id.* at 2139 (concluding that where "history [is] ambiguous at best," it "is not sufficiently probative to defend [a statute]").

### c. Section 922(g)(3) fails *Bruen*'s "text-and-history" Second Amendment standard and has been unconstitutionally applied to Simmons.

By dispensing with means-ends scrutiny, *Bruen* refined *Heller* to the point that all modern federal firearm regulations are now subject to reexamination under the

Second Amendment, using *Bruen*'s plain text and history standard. Applying that standard, the district court should have sustained Simmons' PSR objections.

Under *Bruen's* framework, § 922(g)(3) violates Simmons' Second Amendment right to keep and bear arms. The amendment's "plain text" protects the conduct of keeping and bearing arms. It does not differentiate between who can or cannot keep and bear arms, including between drug users or non-drug users, and a total prohibition on firearm possession by drug users and/or addicts presumptively violates the Second Amendment. The Government cannot rebut that presumption. Drug users' and addicts' access to firearms is "a general societal problem that has persisted since the 18th century," and so the Government must show a robust tradition of regulations (i.e. enacted laws) "distinctly similar" to § 922(g)(3). *Bruen*, 142 S. Ct. at 2131. Drug user/addict-disarmament statutes, however, did not appear until the 20th century; the "Founders themselves could have adopted" drug user/addict-disarmament laws, but did not do so. *Ibid.* Because there was no "historical tradition," as of 1791, of regulations "distinctly similar" to § 922(g)(3), that statute violates the Second Amendment. *Ibid.*

i. **The Second Amendment's "plain text" protects Simmons' possession of non-NFA firearms.**

*Bruen* directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's ***conduct***." *Bruen*, 142 S. Ct. at 2126 (emphasis

added). The answer to that question is easy in Simmons' case. The Second Amendment's operative clause contains three textual elements: it protects the right of (1) "the people" to (2) "keep and bear" (3) "Arms." Simmons satisfied all three elements with respect to his possession of the unregistered non-NFA firearms seized from his home on January 3, 2023, and used to later enhance his Guideline calculations.

The PSR detailed Simmons' possession, or keeping, mostly non-NFA firearms in his home. JA118-121. "Arms" under the Second Amendment include all firearms that are not dangerous and unusual, and which are in common use. *Heller*, 554 U.S. at 581. This would include the non-NFA AR-style firearms and components seized from Simmons' home on January 3, 2023. *See, e.g., Miller v. Bonta*, 2023 WL 6929336 (S.D. Cal. 2023). *Heller* further defines "keep" as "to retain; not to lose," "to have in custody," and "to hold; to retain in one's power or possession"—in short, to "have weapons." *Heller*, 554 U.S. at 582.

Contrary to the Government's assertions below, even with his NFA violative conduct and related conviction, Simmons is still part of "the people" protected by the Second Amendment. Just as that amendment does not "draw[] a home/public distinction with respect to the right to keep and bear arms," *Bruen*, 142 S. Ct. at 2134, it does not draw a drug user/addict versus non-drug user distinction.

"Nothing in the Second Amendment's text" suggests those who have been drug users or addicts are unentitled to the amendment's protection. *Ibid.*

*Heller* confirms this conclusion. Construing the words "the people," the Supreme Court said "the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. It interpreted "the people" to refer to all "persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Ibid.* Thus the Second Amendment right "is exercised individually and belongs to all Americans." *Id.* at 581. Interpreting "the people" to exclude drug users and/or addicts would contradict *Heller*'s Second Amendment application to "all Americans." In addition, *Heller* explained that "the people" is a "term of art" that bears a uniform meaning across the First, Second, Fourth, and Ninth Amendments. *Heller*, 554 U.S. at 580. The result is that, if drug use or addiction deprives someone of his Second Amendment right to bear arms, it would also deprive him of his First Amendment rights to speak about matters of public concern and worship according to his faith, and his Fourth Amendment right to be free from warrantless searches of his home. To counsel's knowledge, no court that has ever endorsed that proposition. *See, e.g., United States v. Perez-Gallan*, 640 F. Supp. 3d 697, 708 (W.D. Tex. 2022)(striking down 18 U.S.C. § 922(g)(8), which bars firearm possession by people subject to intimate-partner restraining orders,

and explaining that because such people "may invoke the protections of [the First and Fourth Amendments]," they may also invoke the protections of the Second); *United States v. Meza-Rodriguez*, 798 F.3d 664, 670-71 (7th Cir. 2015) (concluding "the term 'the people' in the Second Amendment has the same meaning as it carries in other parts of the Bill of Rights" and therefore should be interpreted "as consistent with the other amendments passed as part of the Bill of Rights," such as the First and Fourth Amendments). Notwithstanding this straightforward interpretation of the Second Amendment's "plain text," the Government argued below that "the people" comprises only law-abiding people. JA066-068. This argument derives from language in *Heller* related to determining the proper standard of review for Second Amendment claims. In rejecting the "interest-balancing inquiry" proposed in Justice Breyer's dissent, the *Heller* majority explained that the Second Amendment "is the very product of an interest balancing by the people." *Heller*, 554 U.S. at 634-35. Judges therefore lack authority to "conduct [that balancing] anew" or "decide on a case-by-case basis whether the right is really worth insisting upon." *Ibid.* And regardless, the Court wrote, "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. This latter sentence, the Government's argument goes, limits the right to keep and bear arms to "law-abiding, responsible citizens."

This argument definitely misreads *Heller*. By beginning the quoted passage with "whatever else it leaves to future evaluation," the Supreme Court in *Heller* made clear that its reference to "law-abiding, responsible citizens" established a Second Amendment floor, not a ceiling. The Court held that law-abiding, responsible citizens have a right to possess firearms, but it did not address, much less rule out, whether other people have that right too. Rather, *Heller* expressly left that question "to future evaluation." *Heller*, 554 U.S. at 635. *Heller*'s "law-abiding" statement was not meant to amend, *sub silentio*, its holding that "the people" are all members of the national community, and "not an unspecified subset." *Id.* at 580.

*Heller* "conclusively established [that] the Second Amendment applies to law-abiding and peaceable citizens **at the very least**." *Stimmel v. Sessions*, 879 F.3d 198, 204-05 (6th Cir. 2018)(emphasis added). *Heller*'s "law-abiding" language does not "demarcate [the Second Amendment's] outer limit" or "exclude[]" anyone from the amendment's coverage, it merely establishes that certain people do fall within the amendment's reach. *Ibid.*; *see also Perez-Gallan*, 640 F. Supp. 3d at 708 (explaining *Heller* "defined 'the people' as 'members of the political community,' not 'law-abiding, responsible citizens'"). *Heller*'s qualifying language is clear, but to the extent it was ambiguous, *Bruen* resolved any ambiguity. The passage cited above references law-abiding, responsible citizens' right to use arms "in defense of hearth and home." If that passage were meant to mark off the outer edges of the Second

Amendment right, then even law-abiding, responsible citizens would have no right to use firearms outside the home. But *Bruen* held the Second Amendment right does extend outside the home, and the Court in *Bruen* gave no hint it believed it was contradicting *Heller* in that regard. Thus *Bruen* confirms that it would be a mistake to read *Heller*'s "law-abiding, responsible citizens" language as a limitation on the Second Amendment.

In the district court, the Government argued *Bruen* supports its view that Second Amendment rights are "limited" to law-abiding citizens. JA066-068. It is true that at several points, *Bruen* uses the term "law-abiding." *See, e.g., Bruen*, 142 S. Ct. at 2156 ("New York's proper-cause requirement violates the [Second] Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms."). But *Bruen* repeated the "law-abiding" appellation because the petitioners in that case alleged, "[a]s set forth in the pleadings below," that they were "law-abiding, adult citizens," and the Court granted *certiorari* to decide only whether "New York's denial of petitioners' license applications violated the Constitution." *Id.* at 2124-25. No other questions were before the Court in *Bruen*, and at no point did the Court say Second Amendment rights are limited to law-abiding citizens.

*Bruen* reaffirmed *Heller*'s holding that the Second Amendment right belongs to "'all Americans.'" *Bruen*, 142 S. Ct. at 2156, *quoting Heller*, 554 U.S. at 581. That

statement cannot be reconciled with the Government's view that *Bruen* (implicitly) limits the arms right to only law-abiding citizens. *Bruen* also repeated *Heller*'s instruction that courts should give "the Second Amendment's language" its "'normal and ordinary' meaning." *Id.* at 2127, *quoting Heller*, 554 U.S. at 576. There is nothing normal or ordinary about reading "the people" to mean only "law-abiding people." *Bruen* held "that ordinary, law-abiding citizens have [the] right to carry handguns publicly for their self-defense." *Id.* at 2122. If the word "law-abiding" in that sentence limits the Second Amendment's scope, then the word "ordinary" must do so, too. But surely the Government does not believe unordinary citizens lack Second Amendment rights. It cannot be that the Supreme Court meant to exclude anyone deemed abnormal – a term with no discernible meaning – from exercising a fundamental, enumerated constitutional right. Limiting the Second Amendment by negative implication is equally unjustified regarding "law-abiding."

The Third Circuit addressed the lack of impact of *Bruen*'s "law abiding" language on 18 U.S.C. § 922(g)(1) in *Range v. Attorney General United States of America*, 69 F.4th 96, 101-103 (3d Cir. 2023). The court concluded that because the criminal histories of the plaintiffs in *Heller*, *McDonald*, and *Bruen* were not at issue in those cases, references to "law-abiding, responsible citizens" were *dicta*. *Id.* at 101. The court noted that "the phrase 'law-abiding, responsible citizens' is as expansive as it is vague" and that "the Government's claim that only 'law-abiding, responsible

citizens' are protected by the Second Amendment devolves authority to legislators to decide whom to exclude from 'the people.'" *Id.* at 102. The court "reject[ed] that approach because such 'extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label.'" *Id.* at 102-103 "In sum," the court concluded, "we reject the Government's contention that only 'law abiding, responsible citizens' are counted among 'the people' protected by the Second Amendment." *Id.* at 103. Therefore, § 922(g)(3) regulates and burdens protected Second Amendment conduct.

Simmons, who is an American citizen, is part of the United States' "national community." *Heller*, 554 U.S. at 580. He remained part of the "national community," despite any purported regular drug use or his NFA conviction. Simmons is therefore among "the people" protected by the Second Amendment, his non-NFA firearm conduct is protected by the Second Amendment's text, and 18 U.S.C. § 922(g)(3) and U.S.S.G. § 2K2.1(a)(4)(B)(ii)(I) are both presumptively unconstitutional under *Bruen*'s first step. *Bruen*, 142 S. Ct. at 2126.

Other courts have held the same with respect to 18 U.S.C. § 922(g)(3). *See, e.g., United States v. Daniels*, 77 F.4th 337, 342-343 (5th Cir. 2023); *United States v. Okello*, 2023 WL 5515828, at *3 (D.S.D. 2023); *United States v. Espinoza-Melgar*, 2023 WL 5279654, at *3 (D. Utah 2023); *United States v. Wuchter*, 2023 WL 4999862, at *2 (N.D. Iowa 2023); *United States v. Springer*, 2023 WL 4981583, at *2 (N.D. Iowa

2023); *United States v. Alston*, 2023 WL 4758734, at *6 (E.D.N.C. 2023); *United States v. Lewis*, 2023 WL 4604563 (S.D. Ala. 2023); *United States v. Connelly*, 2023 WL 2806324 (W. D. Tex. 2023); *United States v. Harrison*, 2023 WL 1771138 at *8-9 (W.D. Okla. 2023); *United States v. Lewis*, 2023 WL 187582, at *2 (W.D. Okla. 2023).

As they have with respect to 18 U.S.C. § 922(g)(1). *See, e.g., United States v. Prince*, 2023 WL 7220127, at *4-5 (N.D. Ill. dec. Nov. 2, 2023); *United States v. Jackson*, 2023 WL 7160921, at *5-6 (N.D. Ill. 2023); *United States v. Ford*, 2023 WL 7131742 (S.D.N.Y. 2023); *United States v. Brooks*, 2023 WL 6880419 (E.D. Ky. 2023); *United States v. Coleman*, 2023 WL 6690935, at *5-6 (E.D. Va. 2023); *United States v. Johnson*, 2023 WL 6690388, at *3 (N.D. Ill. 2023); *United States v. Levasseur*, 2023 WL 6623165, at *2-3 (D. Me. 2023); *United States v. White*, 2023 WL 6066201, at *4 (S.D.N.Y. 2023); *United States v. Johnson*, 2023 WL 6049529, at *4-5 (W.D. Okla. 2023); *United States v. Gates*, 2023 WL 5748362 (N.D. Ill. 2023); *United States v. Lane*, 2023 WL 5614798, at *2 (D. Vt. 2023); *United States v. Nordvold*, 2023 WL 5596623, at *4 (D.S.D. 2023); *United States v. Quailes*, 2023 WL 5401733 (M.D. Pa. 2023); *United States v. Davila*, 2023 WL 5361799, at *2 (S.D.N.Y. 2023); *United States v. Holmes*, 2023 WL 4494340 (E.D. Mich. 2023); *United States v. Bullock*, 2023 WL 4232309, at *20, *29 (S.D. Miss. 2023); *United States v. Hernandez*, 2023 WL 4161203, at *3-4 (N.D. Tex. 2023); *United States v. Ware*, 2023 WL 3568606, at *5 (S.D. Ill. 2023); *United States v. Lowry*, 2023 WL 3587309, at *3 (D.S.D. 2023); *United States v.*

*Martin*, 2023 WL 1767161, at *2 (D. Vt. 2023); *United States v. Barber*, 2023 WL 1073667, at *5-6 (E.D. Tex. 2023); *United States v. Hester*, No. 1:22-cr-20333-RNS, ECF No. 39 (S.D. Fla. Jan. 27, 2023); *Campiti v. Garland*, 649 F. Supp. 3d 1 (D. Conn. 2023); *United States v. Goins*, No. 647 F. Supp. 3d 538 (E.D. Ky. 2022); *United States v. Pierre*, No. 1:22-cr-20321-JEM, ECF No. 53 (S.D. Fla. Nov. 28, 2022); *United States v. Williams*, 2022 WL 18285005 (N.D. Ga. 2022); *United States v. Price*, 635 F. Supp. 3d 455, 460 (S.D. W. Va. 2022).

And with respect to 18 U.S.C. §§ 922(g)(8) & (9). *See, e.g., United States v. Lewis*, 2023 WL 6066260, at *4 (S.D.N.Y. 2023); *United States v. Springer*, 2023 WL 4981583, at *2 (N.D. Iowa 2023); *United States v. Brown*, 2023 WL 4826846, at *5-6 (D. Utah 2023); *United States v. Guthery*, 2023 WL 2696824 (E.D. Cal. 2023); *United States v. Silvers*, 2023 WL 3232605 (W.D. Ky. 2023); *United States v. Combs*, 2023 WL 1466614, at *3 (E.D. Ky. 2023); *United States v. Ryno*, 2023 WL 3736420, at *12-14 (D. Alaska 2023); *United States v. Bernard*, 2022 WL 17416681, at *7 (N.D. Iowa 2022); *United States v. Jackson*, 2022 WL 3582504, at *2 (W.D. Okla. 2022).

And, finally, with respect to 18 U.S.C. § 922(n). *See, e.g., United States v. Gore*, 2023 WL 2141032, at *2 (S.D. Ohio 2023); *United States v. Rowson*, 2023 WL 431037, at *15-19 (S.D.N.Y. 2023); *United States v. Hicks*, 2023 WL 164170 (W.D. Tex. 2023); *United States v. Reaves*, No. 4:22-cr-224-HEA, ECF No. 55 at 16 (E.D. Mo. Jan. 9,

2023); *United States v. Stambaugh*, 641 F. Supp. 3d 1185, 1189-1190 (W.D. Okla. 2022); *United States v. Kays*, 624 F. Supp. 3d 1262 (W.D. Okla. 2022).

A growing number of courts recognize that the inquiry under *Bruen*'s first step is a narrow one. They have held that citizens charged with a crime, even a crime based on prior criminal conduct, easily fall within the ambit of the Second Amendment. Simmons' non-NFA conduct in this case, simple possession of non-NFA firearms in his home, falls within the scope of the Second Amendment.

### 2. The Government failed to show that § 922(g)(3) is consistent with the United States' "historical tradition of firearm regulation."

To rebut *Bruen*'s presumption of unconstitutionality, the Government had to establish that § 922(g)(3) "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. The Government did not even try to do this before the district court, and effectively waived the issue. Even if deemed not to be prevented from arguing otherwise, however, the United States still cannot carry its burden before this Court.

### a. There is no tradition of statutes "distinctly similar" to § 922(g)(3).

The threshold question in *Bruen*'s historical inquiry is whether the problem addressed by § 922(g)(3) is longstanding or of more recent provenance. The answer is clear: the "general societal problem" at which § 922(g)(3) is directed – i.e., drug

users/addicts – essentially impaired citizens' access to guns – "has persisted since the 18th century." *Bruen*, 142 S. Ct. at 2131. *See United States v. Harrison*, ___ F. Supp. 3d ___, 2023 WL 1771138, *6 (W.D. Okla. 2023). As a result, § 922(g)(3) is unconstitutional unless the Government shows a robust tradition of "distinctly similar" regulations as of 1791, when the Second Amendment was ratified. *Ibid.* The Government cannot defend § 922(g)(3) through "analogical reasoning" and the "relevantly similar" test, which are reserved for statutes aimed at "unprecedented" problems that would have been "unimaginable" at the founding. *Id.* at 2132. The potential danger posed by drug users'/addicts' access to firearms would not have been foreign to the Founders. Again, the Government did not even attempt to carry its burden in district court. Yet Simmons' PSR objections and related sentencing memorandum explained that *Bruen* established dual-track review of historical evidence: a "distinctly similar" test for statutes aimed at longstanding problems, and a "relevantly similar" test for statutes directed to "unprecedented" problems. JA028-029. Defendant's memorandum further explained that, because drug users'/addicts' access to firearms "has persisted since the 18th century," *Bruen*, 142 S. Ct. at 2131, the Government had to satisfy the "distinctly similar" standard, not the "relevantly similar" standard. JA031. In its response, the Government did not dispute that the standard for reviewing historical evidence varies depending on whether a statute addresses an old or a new problem. Nor did it deny that drug

users'/addicts' access to firearms has been a (potential) problem since at least 1791. JA034-43. Instead, the Government simply ignored the "distinctly similar" requirement or anything about *Bruen*'s second step, opting instead to solely argue *Bruen*'s first step – asserting the Second Amendment and *Bruen* do not apply to the Sentencing Guidelines, JA036, and that Simmons did not enjoy any Second Amendment protections because he was not a law abiding citizen. JA0037.

Even assuming the Government has not abandoned any argument that it can satisfy the "distinctly similar" test of *Bruen*'s second prong, it will be unable to do so on appeal. Although *Bruen* did not expressly define "distinctly similar," it indicated the standard is a stringent one. The only historical regulation *Bruen* identified as sufficiently similar to New York's proper-cause requirement was an 1871 Texas law forbidding "anyone from 'carrying on or about his person . . . any pistol . . . unless he has reasonable grounds for fearing an unlawful attack on his person.'" *Bruen*, 142 S. Ct. at 2153, *citing* 1871 Tex. Gen. Laws § 1. This "reasonable grounds" requirement was essentially identical to New York courts' interpretation of that state's proper-cause standard. *Id.* at 2123-24 n.2. In a challenge to § 922(g)(3), then, a "distinctly similar" historical regulation would be one that either permanently denied or substantially limited drug users'/addicts' access to firearms. But no such statutes appear in the 18th- or 19th-century record.

What is today § 922(g)(3) traces its origins to 1968, when Congress passed Title I of the Omnibus Crime Control and Safe Streets Act of 1968 (the "Gun Control Act"), and added § 922 to 18 U.S.C. ch.44 - prohibiting any person "who is an unlawful user of or addicted to marihuana or any depressant or stimulant drug … or narcotic drug" from (d) being <u>sold</u> firearms or ammunition, (g) <u>transporting</u> or <u>shipping</u> firearms or ammunition, and (h) <u>receiving</u> firearms or ammunition. Pub. L. 90-618, Oct. 22, 1968, 82 Stat. 1213, 1217, 1200-1221. Later in 1986, Congress added firearm or ammunition <u>possession</u> to the list of unlawful acts prohibited by 18 U.S.C. § 922(g), including the possession of such items by "an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))." Pub. L. 99-308, May 19, 1986, 100 Stat. 449, 451-452 (the "Firearm Owners Protection Act"). *See Harrison*, ___ F. Supp. 3d ___, 2023 WL 1771138, at *2. Like § 922(g)(1), therefore, § 922(g)(3) "is firmly rooted in the twentieth century," *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011) – having been enacted roughly 177 years after adoption of the Second Amendment. Separately, the U.S. Sentencing Guidelines did not come into existence until 1987, three years after Congress passed the Sentencing Reform Act.

The Supreme Court in *Bruen* said it would not even "address any of the 20th-century historical evidence brought to bear by respondents or their *amici*," since evidence of that type "does not provide insight into the meaning of the Second

Amendment when it contradicts earlier evidence." *Bruen*, 142 S. Ct. at 2154 n.28. Regulations of such recent vintage cannot establish a historical tradition unless they "confirm[]" earlier practice. *Id.* at 2137. Here, they simply do not. Section 922(g)(3) "bears little resemblance to laws in effect at the time the Second Amendment was ratified." *National Rifle Ass's of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 196 (5th Cir. 2012).

In 2007, Robert H. Churchill, a history professor at the University of Hartford, undertook "a full survey of printed session laws pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 143 n.11 (2007). Based on that survey, Churchill concluded that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." *Id.* at 142.

Carlton Larson, a professor at the University of California-Davis School of Law, has written in the context of disarming felons that, "[a]s far as [he] can determine, state laws prohibiting felons from possessing firearms or denying firearms licenses to felons date from the early part of the twentieth century." Carlton F.W. Larson, *Four Exceptions in Search of a Theory*, 60 Hastings L.J. 1371, 1376 (2009). Other scholars agree. Although it is difficult "to prove a negative, one can

with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I." C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009). It appears New York became the first state to enact such a ban, when in 1917 it made a felony conviction a basis for revoking a concealed-weapon permit. No other state passed a felon-disarmament law until 1923. *Ibid.; see also* Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009)("Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding."); Nelson Lund, *The Second Amendment, Heller, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1357 (2009)(similar); Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 Wash. U. L. Rev. 1187, 1211 (2015)(similar). Drug user/addict disarmaments obviously came much later in 1968 and 1986.

That the Founding generation would have been reluctant, if not unwilling, to embrace permanent citizen disarmament as a mechanism for societal problem solving, in any context, is not surprising given the historical circumstances in which the Constitution and the Second Amendment were ratified. British General Thomas Gage's unprecedented deception during the siege of Boston between April 19, 1775 and March 17, 1776, was still very much "top of mind" with the founding generation when our Constitution was ratified in 1791. Recall that shortly after the

Battle of Lexington and Concord, Gage extended the offer to Boston colonists to disarm themselves under the promise of being allowed to leave the city. In response, Boston residents surrendered thousands of firearms and related weapons: 1778 muskets, 634 pistols, 973 bayonets, and 38 blunderbusses. The number of firearms seized by one account was one for every 5.6 inhabitants of a town with a population of 15,000. Having disarmed the local populace, within five days Gage reneged on his promise to allow any exit from Boston, and kept the entire city captive for eleven months. Nothing like that had ever happened in the American Colonies before, nor has it happened since. *See* Stephen P. Halbrook, *When the Redcoats Confiscated Guns*, Washington Post (May 31, 1995);[9] Stephen P. Halbrook, *That Every Man Be Armed* at 59 (University of New Mexico Press 1984); Stephen P. Halbrook, *The Founders' Second Amendment* at 2-3, 75-108 (Ivan R. Dee Publishers 2008).

> As noted in Mr. Halbrook's treatise:
>
> Americans were reminded of Gage's confiscation of arms some fourteen years later, when adoption of the Bill of Rights was pending. In 1789, Dr. David Ramsay published his *History of the American Revolution*. A prominent federalist, Ramsay wrote this work while he was a member of the Continental Congress in the 1780s. He also served as a delegate to the South Carolina convention that ratified the Constitution in 1788. James Madison, who served with Ramsay in the Continental Congress, was aware of the book. Ramsay's

---

[9] Available online at https://www.washingtonpost.com/archive/opinions/1995/05/31/when-the-redcoats-confiscated-guns/e38d0810-af85-4949-8d93-3da746601e65/ (last viewed December 5, 2022)

account of grievances leading to the Revolution was apropos, particularly in regard to what became the Second Amendment.

*The Founders' Second Amendment*, at 85-86 (footnotes omitted).

There was no "historical tradition" of gun regulations "distinctly similar" to § 922(g)(3) at the time of the Founding. *Bruen*, 142 S. Ct. at 2130-31. The "Founders themselves could have adopted" laws like § 922(g)(3) to "confront" the "perceived societal problem" posed by drug users'/addicts' access to guns. *Id.* at 2131. They declined to do so, and that inaction indicates § 922(g)(3) "[i]s unconstitutional," *id.*, and with it U.S.S.G. § 2K2.1(a)(1)(B)(ii)(I).

## D. 18 U.S.C. § 922(g)(3) is also unconstitutionally vague.

Simmons' position is that he was permitted to mount a facial vagueness challenge under the Fifth Amendment Due Process Clause to 18 U.S.C. § 922(g)(3). *See, e.g., United States v. Morales-Lopez*, 2022 WL 2355920, *3-4 (D. Utah 2022), *citing Johnson v. United States*, 576 U.S. 591, 593-95 (2015). Simmons' separate objection to his being treated as a "prohibited person" for sentencing purposes was what the Utah district court found: that § 922(g)(3)'s indeterminacy based upon the undefined term "unlawful user" or the lack of any precise scope of conduct associated with that term - irrespective of any triggering degree of intoxication or incapacity to safely possess a firearm - rendered it unconstitutionally vague by denying fair notice to defendants and inviting arbitrary enforcement by judges. *See*

*Morales-Lopez* at *3 (citing *Johnson* at 597). JA032. While Simmons acknowledges (as did *Morales-Lopez*) this Court's contrary decision in *United States v. Hasson*, 26 F.4th 610, 219-221 (4th Cir. 2022), he includes the issue to preserve it for further review or a future change in the law.

Simmons still maintains that § 922(g)(3) is unconstitutionally vague as applied to him with respect to the enhancement under U.S.S.G. § 2K2.1(a)(4)(B)(ii)(I). Even taking PSR ¶ 27 (based solely upon Simmons' uncorroborated statement at the time of his January 3, 2023 arrest) as true, JA122, Simmons' admissions did not establish that he was intoxicated or impaired when speaking with officers or when possessing or using any firearm, and more importantly – that he was consistently in such a state as to render him dangerous or otherwise incapable of safely possessing a firearm. Simmons relied upon *Morales-Lopez*'s further reasoning, at *8-12, in his objection and his memorandum submitted in advance of his final sentencing. JA032. Simmons' position is that unconstitutional vagueness served as an alternate basis for not applying the higher BOL, and with it including the non-NFA firearms in his further Guideline calculations under U.S.S.G. § 2K2.1(b).

### E. The district court's error materially impacted Simmons' sentence.

The district court's calculated Guideline range was over double what it would have been had defendant's *Bruen*/§ 922(g)(3) objections been granted. The district

court varied downward almost two years to impose a 36-month sentence. Given the substance of the Court's variance and ultimate sentence, it is not unreasonable to expect had the Court been presented with a lower Guideline range, it likely would have imposed a substantially lower variance sentence. Regardless, the Court was required to correctly calculate Simmons' Sentencing Guidelines, *United States v. Gall,* 128 S. Ct. 586, 596 (2007)*,* before proceeding to apply the sentencing factors under 18 U.S.C. § 3553(a). That it did not do so materially impacted Simmons' sentence, and constituted reversable procedural error. *Peugh v. United States*, 569 U.S. 530, 537 (2013).

## CONCLUSION

This Court should vacate Simmons' sentence based upon the district court's incorrect calculation of his Sentencing Guidelines. The district court's error led to the imposition of a procedurally unreasonable sentence that this Court should vacate, and then remand Simmons' case for resentencing.

## REQUEST FOR ORAL ARGUMENT

This case presents an important question regarding the extent *Bruen* and Second Amendment protected conduct may be considered in federal sentencing practice generally, and in determining the appropriate Sentencing Guidelines for firearm offenses under U.S.S.G. § 2K2.1 specifically. The Court's answer to that question will affect thousands of federal firearms defendants being sentenced under

U.S.S.G. § 2K2.1 in the Fourth Circuit each year. Simmons believes oral argument would certainly assist this Court in resolving this very important question.

Respectfully submitted,

**STEPHEN SIMMONS**
By Counsel

**WESLEY P. PAGE**
**FEDERAL PUBLIC DEFENDER**

**s/Lex A. Coleman** _____
Lex A. Coleman
Senior Litigator, AFPD
Office of the Federal Public Defender, SDWV
Room 3400, United States Courthouse
300 Virginia Street East
Charleston, WV 25301
Phone: (304) 347-3500
E-mail: lex_coleman@fd.org

**s/Jonathan D. Byrne** _____
Jonathan D. Byrne
Appellate Counsel
Office of the Federal Public Defender, SDWV
Room 3400, United States Courthouse
300 Virginia Street East
Charleston, WV 25301
Phone: (304) 347-3500
E-mail: jonthan_byrne@fd.org

*Dated*: November 15, 2023

# CERTIFICATE OF COMPLIANCE
# WITH TYPEFACE AND LENGTH LIMITATIONS

1.  This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

    this brief contains 11,478 words

2.  This brief complies with the typeface and type style requirements because:

    this brief has been prepared in a proportionally spaced typeface using *Microsoft Word 2016* in *14 pt Garamond.*

    **DATE:**    November 15, 2023

                              s/Lex A. Coleman
                              Lex A. Coleman
                              Senior Litigator AFPD
                              Room 3400, United States Courthouse
                              300 Virginia Street East
                              Charleston, West Virginia 25301
                              E-mail: lex_coleman@fd.org

                              s/Jonathan D. Byrne
                              Jonathan D. Byrne
                              Appellate Counsel
                              Room 3400, United States Courthouse
                              300 Virginia Street East
                              Charleston, West Virginia 25301
                              E-mail: jonathan_byrne@fd.org